**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CAROL CHUPCAVICH,** | : | **Civil No. 3:15-CV-2467** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **CAROLYN W. COLVIN,** | : | |
| **Commissioner of the** | : | |
| **Social Security Administration** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

### I.   INTRODUCTION

This is the plaintiff's second application for social security disability benefits. Chupcavich had previously filed an application for disability insurance benefits which was denied by an Administrative Law Judge on June 15, 2006. (Tr. 12.) Some six years then passed before Chupcavich filed this second application for disability insurance benefits on September 24, 2012. (Id.) Remarkably, even though more than six years had passed, in this second application, filed in September of 2012, Chupcavich alleged that the onset of her disability began on June 17, 2006, two days after the denial of her first application.

1

Chupcavich sought benefits under Title II of the Social Security Act, which provides for disability insurance benefits for workers who have become disabled. 42 U.S.C. § 423. Under Title II, "[a] title II worker cannot be found disabled under the Act unless insured status is also met at a time when the evidence establishes the presence of a disabling condition(s)." See SSR 83-20, 1983 WL 31249. Therefore, this second disability application related to a closed period of disability since Chupcavich's last date insured as a worker was December 31, 2006. (Tr. 15.)

Chupcavich's application for benefits during this closed six month period in 2006 was supported by medical opinions which were prepared long after this closed period, and in one instances included a medical opinion from a medical source who had not even begun to treat Chupcavich until 2010, four years after the alleged period of disability. Further, the actual treatment records pertaining to Chupcavich's care were fairly unremarkable for this closed period of claimed disability, but showed some increasing symptoms in the years *after* this claimed closed period of Title II disability, June 17 through December 31, 2006.

Upon a review of the extremely limited medical evidence supporting Chupcavich's 2012 claim of disability during a six month period in 2006, the Administrative Law Judge (ALJ) denied this application for Title II benefits. (Tr. 12-24.) Chupcavich has appealed this decision, (Doc. 1.), but for the reasons set forth

2

below, upon a consideration of the entire record in this matter, finding that the ALJ's decision denying benefits is supported by substantial evidence which was thoroughly addressed in the administrative agency proceedings, the decision of the Commissioner will be affirmed.

## II.   STATEMENT OF FACTS AND OF THE CASE

### A.   THE MEDICAL EVIDENCE RELATING TO CHUPCAVICH'S CLOSED PERIOD OF CLAIMED DISABILITY

As we have noted this case involves a Title II application for disability benefits relating to a closed six month period of claimed disability, June 17, 2006 through December 31, 2006.  With respect to this closed period of alleged disability, Chupcavich claimed that she was disabled due to the combined effects of fibromyalgia, carpel tunnel syndrome, osteopenia, related joint disease, headaches and memory problems.  (Tr. 159.)

The medical evidence in support of this application, as it related to the closed period of disability in 2006, was extremely limited and reflected a generally unremarkable course of treatment for Chupcavich.  Chupcavich was seen by her primary care physician, Dr. Oley, three times between June and December 2006.  (Tr. 949.)  At the first of these appointments, a new patient appointment  on June 29, 2006, Chupcavich complained of fibromyalgia, back pain, poor sleep and memory

loss. (Tr. 704-05.) Dr. Oley conducted some testing which confirmed bilateral tender points in Chupcavich's back, and ordered an array of tests, but initially prescribed a very conservative course of treatment, consisting of exercise and use of a TENS unit. (Tr. 705.) Blood tests conducted at this time were unremarkable and indicated a normal sedimentation rate, which ruled out rheumatoid arthritis. (Tr. 746.) Chupcavich's thyroid hormone level, cardiac profile, and general blood chemistry report were all within normal ranges except for calcium, glucose, and sodium levels, which were low (Tr. 747-49.) Likewise, a sleep study at Geisinger Sleep Disorders Center on July 17, 2006, was negative for obstructive sleep apnea and there were no periodic limb movements observed. (Tr. 281-82.)

In August 2006, Dr. Oley saw Chupcavich again to follow up on her fibromyalgia complaint. (Tr. 703.) At that time, x-rays and test results were all normal, and there was no material change in her conservative course of treatment. (Tr. 19.) Finally, in December of 2006 Dr. Oley saw Chupcavich after she suffered a broken rib. The doctor prescribed Percocet for the pain caused by her rib injury, but did not make any other significant medical findings at this time. (Tr. 702.)

These sparse medical records, which reflected medical concerns of a non-urgent nature, fairly benign test results, and a conservative course of treatment, represent the totality of the objective medical evidence which supported

Chupcavich's claim of total disability during this closed period of Title II benefit eligibility.

While medical evidence relating to Chupcavich's subsequent care and treatment in the seven years following this closed period of benefit eligibility suggest that Chupcavich's conditions have progressively worsened over time, the progression of her illness, as demonstrated in the medical records, further undercuts any claim that she was disabled between June and December 2006.  Indeed, it appears that years passed after this closed period of eligibility before Chupcavich sought more aggressive treatment for her worsening medical conditions.  For example, it seems that Chupcavich first began treatment with a rheumatologist in October of 2008, two years after her disability eligibility expired.  (Tr. 294.)  Further, Chupcavich only commenced active, on-going pain management treatment in 2010 and 2011, four years after her disability eligibility expired.  (Tr. 445-47, 899-905.)  This significant temporal gap between Chupcavich's claimed closed period of disability, and her actual treatment for these allegedly disabling conditions, further undermined this claim.

Chupcavich's testimony at the hearing conducted on this disability application on December 19, 2013, also raised questions regarding the wholly disabling effect of these medical conditions.  During this limited closed period of Title II disability, June

through December 2006, Chupcavich acknowledged that she drove a car "quite often," (Tr. 39.); sought only intermittent medical treatment, (Tr. 40-41.); engaged in yardwork, shopping cooking and cleaning, (Tr. 41.); participated in physical therapy, (Tr. 42.); and was able to lift light objects and ambulate up stairs. (Tr. 43.)

In contrast to this evidence which suggested that Chupcavich's physical conditions were not wholly disabling in 2006, the plaintiff presented three pieces of countervailing evidence, each of which the ALJ was required to assess in light of the potentially distorting effect of hindsight.  First, Chupcavich provided the ALJ with a 2012 letter from a pain management physician, Dr. Janerich.  (Tr. 899-905.)  In this letter the doctor acknowledged that he had only begun treating Chupcavich in 2010, four years after this period of disability came to a close.  Nonetheless, Dr. Janerich opined that Chupcavich suffered from disabling physical conditions, and offered an opinion that those conditions were disabling five years prior to his first medical encounter with the plaintiff, in 2005.  (Id.)  In addition, Chupcavich's spouse described his perception of Chupcavich's physical limitations over the years. (Tr. 61-75.) While Mr. Chupcavich's testimony generally supported the plaintiff's disability claim, and indicated that these disabling conditions had existed seven years prior, in 2006, there was an equivocal quality to this testimony of past disability, with Mr. Chupcavich stating that, with respect to the decline in his wife's condition since

6

2006: "it's still kind of the same.  It's probably gotten worse, but at least the same."

(Tr. 61.)  Finally, Chupcavich's primary care physician, Dr. Oley, wrote a letter in

support of her disability claim on December 31, 2013, seven years after this closed

period of disability came to an end.  (Tr. 949-50.)  This letter described the doctor's

on-going treatment of the plaintiff, and opined that her conditions were disabling.

(Id.)  Yet, while reaching these conclusions, Dr. Oley acknowledged that his actual

treatment records only reflected three medical encounters with the plaintiff during the

period form June through December 2006.  Furthermore, the doctor conceded that at

that time "I probably would have been reserved in my assessment of her work

capacity."  (Tr. 949.)  Thus, it was only with the hindsight of treatment over a seven

year span that the doctor now opined that Chupcavich was wholly disabled many

years earlier, in 2006, an assessment that was not borne out by the doctor's

contemporaneous treatment records.  (Id.)

It is against the backdrop of this sparse medical record pertaining to this closed

period of Title II disability eligibility that the ALJ issued its March 4, 2014, decision

denying Chupcavich's second application for DIB benefits.  (Tr. 12-24.)

## B.    THE ALJ DECISION

On March 4, 2014, the Administrative Law Judge (ALJ) issued a decision

denying Chupcavich's second, closed period Title II DIB application.  (Tr. 12-24.)

In this decision, the ALJ noted the denial of Chupcavich's prior application, and identified the relevant temporal scope of this application to be the six months between June and December 2006. (Tr. 12, 15.) Neither of these findings are contested in this appeal.

The ALJ then went on the analyze this closed period disability claim under the familiar five-step framework which applies to such claims. In conducting this analysis the ALJ found at step two of this analysis that Chupcavich suffered from the following severe impairments: fibromyalgia, carpel tunnel syndrome, and osteopenia. (Tr. 15.) The ALJ also identified other, non-severe, impairments, including endmetriosis, rib fracture and disc disease. (Tr. 15.) At step three the ALJ concluded that none of these impairments met the exacting requirements of a Social Security listing which would have rendered the impairment *per se* disabling. (Tr. 17-18.) Evaluating the sparse objective medical evidence relating to the closed benefit period of June through December 2006, and also assessing the countervailing testimony and evidence, the ALJ concluded that Chupcavich had retained the residual functional capacity to perform light work during this six month period in 2006. In reaching this conclusion, the ALJ focused upon the lack of objective medical evidence which would have supported a finding of total disability in 2006. (Tr. 18-21.) The ALJ also observed that Chupcavich's acccount of her own activities of daily living in 2006 was

8

consistent with a limited capacity for performing light work. (Id.) The ALJ largely discounted the *post hoc* evidence provided by Mr. Chupcavich, Dr. Janerich and Dr. Oley in 2012 and 2013, to the extent that it suggested that Chupcavich had been wholly disabled six years earlier, in 2006. (Id.) On this score, the ALJ noted that, since Dr. Janerich's first medical encounter with Chupcavich took place four years after this closed period of claimed disability, his opinion regarding her condition years prior to any treatment deserved no weight. (Id.) The ALJ acknowledged that Mr. Chupcavich and Dr. Oley both had first hand experience with the plaintiff during 2006, but found that their testimony did not establish that the plaintiff was wholly disabled for several reasons. First, the ALJ observed that the testimony of these witnesses was not supported by the objective medical data, or Chupcavich's reported activities of daily living. The ALJ also noted that Chupcavich's subsequent medical history, which revealed that she delayed for several years before seeking further treatment for these conditions, was inconsistent with the claimed severity of her symptoms in 2006. (Id.) The ALJ also acknowledged the potentially distorting influence of hindsight when witnesses are called upon to recall events which occurred seven years earlier, and particularly noted that these considerations of sympathy and support for a spouse may color the perception of family member like the plaintiff's husband. (Id.)

Having reached these findings regarding the quality of the evidence and the credibility of witnesses, the ALJ determined that Chupcavich had the capacity to perform light work in 2006.  Based upon the testimony of a vocational expert, the ALJ then found that Chupcavich could perform jobs which existed in the national and regional economy in 2006, and concluded that she was not disabled.  (Tr. 21-24.)

This appeal followed.  (Doc. 1.)  The parties have fully briefed their positions in this matter, (Docs. 15 and 16.) and this case is, therefore, ripe for resolution.  For the reasons set forth below, the decision of the Commissioner will be affirmed.

## III.   DISCUSSION

### A.   SUBSTANTIAL EVIDENCE REVIEW – THE ROLE OF THIS COURT

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); 42 U.S.C. §1383(c)(3)(incorporating 42 U.S.C. §405(g) by reference); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200(3d Cir. 2008); Ficca v. Astrue, 901 F.Supp.2d 533, 536(M.D.Pa. 2012).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a

preponderance of the evidence but more than a mere scintilla.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence."  Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966).  "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole."  Leslie v. Barnhart, 304 F.Supp.2d 623, 627 (M.D.Pa. 2003).  The question before this Court, therefore, is not whether plaintiff is disabled, but whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law.  See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014)("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.")(alterations omitted); Burton v. Schweiker, 512 F.Supp. 913, 914 (W.D.Pa. 1981)("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts.");  see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990)(noting that

11

the scope of review on legal matters is plenary); <u>Ficca</u>, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

      **B**.    <u>**INITIAL BURDENS OF PROOF, PERSUASION AND ARTICULATION FOR THE ALJ**</u>

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); <u>see also</u> 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this

process, the ALJ must sequentially determine:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between steps three and four, the ALJ must also assess a claimant's RFC.  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

At steps one through four, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work.  42 U.S.C. §423(d)(5); 42 U.S.C. §1382c(a)(3)(H)(i)(incorporating 42 U.S.C. §423(d)(5) by reference); 20 C.F.R. §§404.1512, 416.912; Mason, 994 F.2d at 1064.

13

Once this burden has been met by the claimant, it shifts to the Commissioner at step five to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC.  20 C.F.R. §§404.1512(f), 416.912(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites.  Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests."  Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981).  Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence.  Id. at 706-707.  In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding."  Schaudeck v. Com. of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

C.   LEGAL BENCHMARKS FOR THE ALJ'S ASSESSMENT OF MEDICAL OPINION EVIDENCE

The Commissioner's regulations defines medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's] symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairments(s), and [a claimant's] physical or mental restrictions.   20 C.F.R. §§404.1527(a)(2), 416.927(a)(2).[1]   Regardless of its source, the ALJ is required to evaluate every medical opinion received.   20 C.F.R. §§404.1527(c), 416.927(c).

In deciding what weight to accord to competing medical opinions, the ALJ is guided by factors outlined in 20 C.F.R. §§404.1527(c) and 416.927(c).   "The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker."   Social Security Ruling ("SSR") 96-6p, 1996 WL 374180 at *2 (S.S.A. 1996).

---

[1]Medical source opinions on issues that are dispositive of a case, i.e., whether a claimant is disabled, are reserved to the Commissioner and do not constitute medical opinions defined by 20 C.F.R. §§404.1527(a)(2) and 416.927(a)(2).   20 C.F.R. §§404.1527(d), 416.927(d).   Such opinions must never be ignored, and must be considered based on the applicable factors in 20 C.F.R. §§404.1527(c) and 416.927(c).   SSR 96-5p, 1996 WL 374183 at *3 (S.S.A. 1996).   However, medical opinions on issues reserved Commissioner, regardless of their source, are never entitled to controlling weight under 20 C.F.R. §§404.1527(c)(2) and 416.927(c)(2).   See 20 C.F.R. §§404.1527(d)(3), 416.927(d)(3); SSR 96-5p, 1996 WL 374183 at *2.

Treating sources have the closest ties to the claimant, and, therefore, their opinions are generally entitled to more weight.  See 20 C.F.R. §§404.1527(c)(2), 416.927(c)(2)("Generally, we give more weight to opinions from your treating sources..."); 20 C.F.R. §§404.1502, 416.902 (defining treating source).  Under some circumstances, the medical opinion of a treating source may even be entitled to controlling weight.  20 C.F.R. §§404.1527(c)(2), 416.927(c)(2); see also SSR 96-2p, 1996 WL 374188 (S.S.A. 1996)(explaining that controlling weight may be given to a treating source's medical opinion only where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it is not inconsistent with the other substantial evidence in the case record).

Where no medical source opinion is entitled to controlling weight, the Commissioner's regulations direct the ALJ to consider the following factors, where applicable, in deciding the weight given to any non-controlling medical opinions: length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; the extent to which the source presented relevant evidence to support his or her medical opinion, and the extent to which the basis for the source's conclusions were explained; the extent to which the source's opinion is consistent with the record as a whole; whether the source is a specialist; and, any other factors brought to the ALJ's attention.  20 C.F.R. §§404.1527(c), 416.927(c).

16

Furthermore, as discussed above, it is beyond dispute that, in a social security disability case, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter, 642 F.2d at 704.  This principle applies with particular force to the opinion of a treating physician.  See 20 C.F.R. §§404.1527(c)(2), 416.927(c)(2)("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). "Where a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or the wrong reason.'" Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999)(quoting Mason, 994 F.2d at 1066)); see also Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000).

### D. THE DECISION DENYING CHUPCAVICH TITLE II BENEFITS FOR A CLOSED SIX MONTH PERIOD BETWEEN JUNE AND DECEMBER 2006 IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND MUST BE AFFIRMED

In this case with respect to Chupcavich's Title II claim, her alleged date of onset was June 17, 2006, two days after the denial of her prior disability claim, and her date last insured was December 31, 2006.  Thus, to prevail on this claim Chupcavich was required to demonstrate that she was wholly disabled during this six month period between June and December 2006.

The ALJ found that Chupcavich did not meet her burden of proof on this narrowly focused claim when she relied upon evidence developed many years after the claimed closed period of disability, and the contemporaneous medical records for this closed period did not support the severity of these alleged impairments.  In our view, substantial evidence supports this finding.  Therefore, given the limited scope of our review in this case we will affirm this finding.

On appeal, Chupcavich challenges this ALJ's decision on three grounds.  First, the plaintiff argues that the ALJ erred at step three of this sequential analysis when the ALJ failed to find that Chupcavich met the *per se* disabling criteria of Social Security listing 14.09.  Chupcavich faces an exacting burden of proof and persuasion in advancing this claim.   At step three of the evaluation process, the ALJ must determine whether a claimant's alleged impairment is equivalent to a number of listed impairments that are acknowledged as so severe as to preclude substantial gainful activity.  20 C.F.R. §416.920(a)(4)(iii); 20 C.F.R. pt. 404, subpt. P, App. 1; Burnett, 220 F.3d 112, 119.  In making this determination, the ALJ is guided by several basic principles set forth by the social security regulations, and caselaw.   First, if a claimant's impairment meets or equals one of the listed impairments, the claimant is considered disabled per se, and is awarded benefits.  20 C.F.R. §416.920(d); Burnett, 220 F.3d at 119.  However, to qualify for benefits by showing that an impairment, or

18

combination of impairments, is equivalent to a listed impairment, plaintiff bears the burden of presenting "medical findings equivalent in severity to *all* the criteria for the one most similar impairment." Sullivan v. Zebley, 493 U.S. 521, 531 (1990); 20 C.F.R. §416.920(d).  An impairment, no matter how severe, that meets or equals only some of the criteria for a listed impairment is not sufficient.  Id.

The determination of whether a claimant meets or equals a listing is a medical one.  To be found disabled under step three a claimant must present medical evidence or a medical opinion that his or her impairment meets or equals a listing.  An administrative law judge is not required to accept a physician's opinion when that opinion is not supported by the objective medical evidence (raw data) in the record. Maddox v. Heckler, 619 F. Supp.  930, 935-936 (D.C.Okl. 1984); Carolyn A. Kubitschek & Jon C. Dubin, Social Security Disability Law and Procedure in Federal Courts, §3:22 (2014), *available at* Westlaw SSFEDCT.  However, it is the responsibility of the ALJ to identify the relevant listed impairments, because it is "the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." Burnett, 220 F.3d  at 120 n.2.

Given that Chupcavich must meet all elements of a listing to prevail at step three of this sequential analysis the plaintiff's step three argument on appeal fails on multiple scores.  First, it fails because the evidence did not show that Chupcavich met

the paragraph A criteria of Listing 14.09 in that she did not demonstrate that she was unable to ambulate effectively.  In this regard, the evidence simply did not show that Chupcavich needed or used a walker, crutches, or two canes to walk during 2006. Likewise, Chupcavich also failed to show that she met or equaled the criteria of paragraph B of Listing 14.09 since she did not demonstrate inflammation or deformity in one or more major peripheral joints with involvement of two or more organs/body systems at a moderate level of severity and at least two of the constitutional symptoms or signs.  Chupcavich also failed to show that she met or equaled the criteria of paragraph C of 14.09, which requires ankylosing spondylitis or other spondyloarthropies with ankylosis (fixation) of the dorsolumbar or cervical spine of 45 or more degrees, or ankylosis of 30 degrees and involvement of two or more organs or body systems to a moderate level of severity.  Finally, Chupcavich's sparse medical evidence from June through December 2006 simply did not  meet the criteria of paragraph D of Listing 14.09 since she did not show repeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs, with a marked limitation of either activities of daily living, maintaining social functioning, or completing tasks in a timely manner due to deficiencies in concentration, persistence or pace.

As the ALJ correctly noted, Chupcavich's diagnostic imaging did not support a listing level severity. Indeed, two years after her insured status expired on December 31, 2006, an MRI of her lumbar spine on May 2, 2008, showed only mild curvature of the spine, mild bulging of the L5-S1 disc, with no significant spinal canal or foraminal compromise. (Tr. 882.) A study of her knees on the same date showed minimal degenerative changes. (Tr. 884.) Thus, while Chupcavich submitted no diagnostic lumbar or extremity studies during the relevant period, studies conducted two years after the relevant period showed no significant findings which would have supported a finding of a *per se* disabling condition. In the absence of such proof, this argument fails.

In addition, the ALJ properly weighed the medical evidence and lay testimony of Chupcavich's spouse. In considering this evidence, the ALJ correctly concluded that the statement of Dr. Janerich, whose clinical encounters with Chupcavich began four years after this closed period of disability, deserved little weight. The ALJ also carefully considered, but discounted, the statement of Chupcavich's treating physician which was prepared seven years after the close of this period of disability. On this score, it is axiomatic that the determination of disability lies with the Commissioner and not with any medical source. In this case, the ALJ carefully considered Dr. Oley's opinion but discounted it since the opinion was not supported

by objective, contemporaneous medical findings and tests, was undermined by the conservative and delayed history of treatment for Chupcavich's conditions, and was inconsistent with some of Chupcavich's own reported activities of daily living during the relevant time frame.   This careful analysis draws support from substantial evidence in the record before the ALJ and, therefore, this determination may not be disturbed on appeal.

Furthermore, the ALJ appropriately addressed and assessed the testimony of Chupcavich's spouse, who was also called upon to testify from a perspective seven years removed from the closed period of claimed disability regarding his wife's medical condition.   When considering such lay testimony, it is well-settled that "'[T]he ALJ must also consider and weigh all of the non-medical evidence before him.' Burnett v. Commissioner of Social Security Administration, 220 F.3d 112, 122 (3d Cir.2000).   The ALJ must consider whether opinions from non-medical sources, such as 'spouses, other relatives, friends, employers, and neighbors,' are consistent with the objective medical evidence.   Social Security Ruling 06–03P, 2006 WL 2329939, at *3, 6 (S.S.A.).   'Although allegations of pain and other subjective symptoms must be consistent with objective medical evidence, the ALJ must still explain why [s]he is rejecting the testimony.'   Burnett, 220 F.3d at 122 (internal citations omitted)."   Eskridge v. Astrue, 569 F. Supp. 2d 424, 439 (D. Del. 2008).

22

Here, the ALJ's decision did precisely what the law and regulations call upon an ALJ to do:  it assessed the spouse's testimony in light of the objective medical evidence.  That testimony, which the ALJ concluded may have been colored by considerations of sympathy and hindsight, simply was not supported by the contemporaneous objective medical evidence.  Instead, these sparse medical records reflected medical concerns of a non-urgent nature, fairly benign test results, and a conservative course of treatment, all of which was inconsistent with wholly disabling illness.  Nor was this testimony congruent with Chupcavich's own statements regarding her activities of daily living, yet another factor which undermined the weight to be given to this evidence.

Finally, on the sparse medical record presented in support of this closed period claim, we find that the ALJ did not err in reaching a residual functional capacity assessment which concluded that Chupcavich could perform light work.  As part of this sequential disability analysis "the ALJ must also determine the claimant's residual functional capacity (RFC).  20 C.F .R. § § 404.1520(e), 416.920(e).  RFC is defined as 'that which an individual is still able to do despite the limitations caused by his or her impairment(s).' Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir.2000) (citations omitted); see also 20 C.F.R. §§ 404.1545, 416.945. In making this assessment, the ALJ considers all of the claimant's impairments, including any

medically determinable non-severe impairments. 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2)." <u>Kalenkoski v. Colvin</u>, No. 3:14-CV-00592, 2014 WL 5093129, at *3 (M.D. Pa. Oct. 10, 2014).

Here, the ALJ found that Chupcavich could perform a modified range of light work, which is defined as work involving lifting no more than ten pounds frequently, twenty pounds occasionally, sitting for two hours, and standing or walking up to six hours a day.  20 C.F.R. § 404.1567(b).  In reaching this RFC assessment for Chupcavich, the ALJ also specifically took into account the particular and credibly established limitations experienced by the plaintiff during this closed period of claimed disability.  Thus, given Chupcavich's history of fibromyalgia and osteopenia the ALJ limited this work to occasional balancing, stooping, crouching, crawling, kneeling, and climbing (but not on ladders, ropes, or scaffolds), and imposed environmental restrictions on exposure to temperature extremes, wetness, humidity, vibrations and hazards, such as working around moving machinery and at unprotected heights. (Tr. 18.) Moreover, given Chupcavich's history of carpal tunnel surgery and fibromyalgia, the ALJ restricted the work to only occasional pushing or pulling with the upper and lower extremities.  (Tr. 18.)  By carefully tailoring this residual functional capacity assessment to the limitations established by the contemporaneous medical evidence, and imposing limitations that were consistent with Chupcavich's

24

own sworn testimony regarding her activities of daily living in 2006, the ALJ properly framed an RFC assessment which comported with the proof. Nothing more is required in this case, and the formulation of this assessment based upon the evidence of record does not compel a remand.

In sum, under the deferential standard of review which applies to Social Security appeals, we conclude that the ALJ's decision is supported by substantial evidence which is articulated by the ALJ. Therefore, this decision will be affirmed. We note, however, that this finding does not necessarily preclude Chupcavich from receiving any benefits for a worsening medical condition. The Social Security Administration oversees a number of programs designed to assist those facing medical challenges. For example, under Title II of the Social Security Act, the Commissioner provides for disability insurance benefits for workers who have become disabled. 42 U.S.C. § 423. Title XVI of the Social Security Act, in turn, establishes the Supplemental Security Income benefit program, or SSI. "The SSI program, which is another public assistance program established by federal statute, see 42 U.S.C. §§ 1381–1383 (1982), provides cash grants to low-income individuals who are aged, blind, or disabled. 42 U.S.C. § 1381 (1982)." Com. of Pa. v. United States, 752 F.2d 795, 797 (3d Cir. 1984).

25

These two programs, which are part of a broader and more comprehensive network of care for the infirm and disabled, each have their own eligibility requirements and standards. Moreover, as the Commissioner has long acknowledged the requirements to qualify for benefits under Title II and Title XVI differ in a number of material respects. See SSR 83-20, 1983 WL 31249. Thus, Title II provides for some retroactive benefits whereas Title XVI does not. Id. Moreover, unlike Title XVI applicants, "[a] title II worker cannot be found disabled under the Act unless insured status is also met at a time when the evidence establishes the presence of a disabling condition(s)." Id. Thus, the availability of relief under Title II and Title XVI may differ significantly, requiring independent evaluation of any claim made under both provisions of the law.

Here, we find that Chupcavich has not met the standards necessary to support a Title II closed period claim for benefits during the period from June through December 2006. We do not opine regarding whether Chupcavich's worsening helath from 2007 to the present would support an independent application for relief under Title XVI. We simply observe, as the Commissioner did, (Doc. 16, p.2.), that such relief may be available to Chupcavich.

## IV.    CONCLUSION

Accordingly, for the foregoing reasons, the decision of the Commissioner is

AFFIRMED.  An appropriate order follows.

Submitted this 28th day of September, 2016.

***S/Martin C. Carlson***
Martin C. Carlson
United States Magistrate Judge
